Peter Gabor **KALMAN,**
Plaintiff–Appellant,

v.

The **BERLYN CORPORATION,**
Defendant/Cross–Appellant.

Nos. 89–1371, 89–1378.

United States Court of Appeals,
Federal Circuit.

Sept. 13, 1990.

---

Rory J. Radding and Thomas F. Reddy, Jr., Pennie & Edmonds, New York City, argued, Charles E. McKenney and Paul J. Zegger, on the brief, for plaintiff-appellant/cross-appellee.

Leonard J. Santisi, Curtis, Morris & Safford, P.C., New York City, Theodore F. Shields, on the brief, for defendant/cross-appellant.

Before RICH, Circuit Judge, SMITH, Senior Circuit Judge, and RE, Chief Judge.*

RE, Chief Judge.

In this patent infringement action, plaintiff, Dr. Peter Gabor Kalman, a British citizen and holder of a United States Patent on a filtering device, appeals from a judgment of the United States District Court for the District of Massachusetts awarding him $735,228 in damages from defendant, The Berlyn Corporation.

Dr. Kalman contends that the district court erred in denying his motion, pursuant to Rules 15 and 21 of the Federal Rules of Civil Procedure, to amend his pleadings to add as a plaintiff Process Developments Ltd. (PDL), a British corporation of which Dr. Kalman is 50% owner. Dr. Kalman also contends that, in the calculation of damages, the district court erred in deducting an amount for British corporate taxes from PDL's lost profits, and in finding that Berlyn's patent infringement was not willful, and, therefore, he was not entitled to enhanced damages. Finally, Dr. Kalman contends that the district court erred in denying his motion for attorney fees.

Berlyn cross-appeals, and contends that the district court erred in determining that Berlyn's continuous filter (CF) and continuous screen shifter (CSS) devices infringe Dr. Kalman's patent. Berlyn also contends that the district court erred in its determination of Dr. Kalman's damages, and in awarding Dr. Kalman prejudgment interest prior to the date that the complaint was filed in this case.

There are five questions presented on these appeals:

1. Whether the district court erred in determining that Berlyn's use of plastic sealing plugs in its CF and CSS devices, and filter bands or ribbons in its CSS device, infringe Dr. Kalman's patent;

2. Whether the district court erred in denying Dr. Kalman's motion, pursuant to Rules 15 and 21 of the Federal Rules of Civil Procedure, to amend its pleadings to add PDL as a plaintiff;

3. Whether the district court erred in its determination of Dr. Kalman's damages;

4. Whether the district court erred in its determination that Dr. Kalman was entitled to prejudgment interest dating from 1977; and

5. Whether the district court erred in denying Dr. Kalman's motion for attorney fees.

## BACKGROUND

In 1967, Dr. Kalman invented a device for the filtration of heat-softened materials. The device, which was intended principally for use in plastic extrusion lines, allows for the continuous filtration of molten plastic at a consistent rate of pressure, and without significant leakage. Dr. Kalman obtained United States Patent No. 3,471,-017 (the '017 patent) on his device. The patent recites in claim 1:

A process for filtering a heat-softened substance flowing through a passage comprising the steps of introducing a filter in the form of a filter band or ribbon by passing it through inlet and outlet ports flanking said passage so that a part of the filter extends across said passage....

Claim 1 also recites that the temperature of the inlet and outlet ports is controlled, "resulting in the formation within said ports of sealing plugs of said substance of adequate rigidity to prevent substantial leakage at said ports...."

In 1967, Dr. Kalman and his brother John formed Process Developments Limited (PDL). PDL, under the '017 patent, manufactured and marketed a device for plastic filtration as the "Autoscreen" de-

* Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designa-

tion.

vice. Dr. Kalman and John Kalman each own 50% of PDL's stock, and are its sole directors.

In 1969, Dr. Kalman was approached by Mr. Gerald Berlyn, president of The Berlyn Corporation, who asked for a license to manufacture filtration devices under the '017 patent. Dr. Kalman refused. In 1976, The Berlyn Corporation began to display and sell its continuous filtration (CF) device. Berlyn's CF device involves the use of linked filter cartridge assemblies which, like PDL's Autoscreen, travel from an inlet port to an outlet port, and traverse the flow of the molten plastic. In addition, like the Autoscreen, the CF device employs heat exchangers at both ports, causing the plastic at the ports to thicken, thereby decreasing the leakage of molten plastic during the filtration process. In addition to its CF device, in 1984 Berlyn began to manufacture and sell a continuous screen shifter (CSS) device, which was a filtration device similar to the CF device.

## 1. *Kimberly–Clark Litigation*

Dr. Kalman brought a patent infringement action against the Kimberly–Clark Corporation, a purchaser and user of Berlyn's CF device, in the United States District Court for the Eastern District of Wisconsin. *See Kalman v. Kimberly–Clark Corp.*, 215 USPQ 158 (E.D.Wisc.1981) (*Kalman I*).

The court in *Kalman I* found that there existed genuine issues of material fact concerning the validity of the '017 patent, and denied Dr. Kalman's summary judgment motion as to the validity of the patent. *See id.* at 160. The court, however, granted Dr. Kalman's motion "that the linked filters in the Berlyn continuous filter devices are equivalents of the 'band or ribbon' described in the patent." *Id.* at 162.

After a trial, in *Kalman v. Kimberly–Clark Corp.*, 561 F.Supp. 628 (E.D.Wisc. 1982) (*Kalman II*), the district court held that the '017 patent was not invalid, and that it had been infringed by Berlyn's CF device.

In *Kalman II*, Kimberly–Clark argued that, on the basis of prior art, the '017

patent was invalid. The court determined that, in contrast to the prior art, the '017 patent allows for "prevention of leakage; continuous filtering; and maintenance of constant temperature and pressure in the plastic upstream." *Id.* at 636. Hence, the court held that the '017 patent was not invalid. *See id.* at 635. Based on its determination in *Kalman I*, the court also held that both the Autoscreen and Berlyn's CF device employ a filter band or ribbon, and that Berlyn's CF device infringes the '017 patent. *See id.* at 636.

On appeal of *Kalman II*, this court affirmed. *See Kalman v. Kimberly–Clark Corp.*, 713 F.2d 760, 218 USPQ 781 (Fed. Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687, 224 USPQ 520 (1984) (*Kalman III*).

## 2. *Berlyn Litigation*

### a. *Kalman IV*

After the district court decision in *Kalman II*, and while Kimberly–Clark's appeal of that case was pending before this court, Dr. Kalman brought this patent infringement action against The Berlyn Corporation, the manufacturer and seller of the infringing CF device, in the United States District Court for the District of Massachusetts. In *Kalman v. Berlyn Corp.*, 614 F.Supp. 1327, 226 USPQ 255 (D.Mass.1985) (*Kalman IV*), Dr. Kalman asserted "that the outcome of the first Wisconsin litigation collaterally estops [Berlyn] on both the validity and infringement issues." *Id.* at 1329, 226 USPQ at 256. Berlyn counterclaimed, seeking a declaratory judgment that plaintiff's patent is invalid and not infringed. *See id.* at 1329, 226 USPQ at 256. The court in *Kalman IV* held that Berlyn "is collaterally estopped on the 'filter band or ribbon' issue, and on the validity issue...." *Id.* at 1331, 226 USPQ at 257.

### b. *Cases on Appeal*
### i) *Kalman V—The Liability Trial*

After the decision in *Kalman IV*, Dr. Kalman's Massachusetts patent infringement suit against Berlyn proceeded to trial.

The trial was bifurcated, with one trial for liability and another for damages. In *Kalman v. Berlyn Corp.*, 3 USPQ2d 1065, 1065, 1987 WL 10246 (D.Mass.1987) (*Kalman V*) (the liability trial), the questions presented were "whether the CF device has 'sealing plugs' falling within plaintiff's patent, and whether the CSS device has 'sealing plugs' and 'filter bands or ribbons' covered by the patent."

The court noted that the only two significant differences between the Berlyn CF and CSS devices were that "the CF machines use hooks and posts to link three filter assemblies, while the CSS machines use an external clamp to compressively hold together two filter plates." *Id.* at 1075. The court also noted that "[i]n the context of the Kalman patent, these differences have no meaning[,]" and concluded that both the CF and CSS devices infringe the '017 patent by the use of "filter bands or ribbons." *Id.*

On the issue of whether Berlyn's CF and CSS devices used plastic "sealing plugs," as described in the '017 patent, the court referred to Berlyn's operator's manual for the CF device, which was introduced at trial. *See id.* The manual stated that Berlyn's CF and CSS devices employ a " 'simple sealing design utilizing the thermodynamic characteristics of the polymer itself to form the seal.' " *Id.* at 1076. In addition, during his testimony, Mr. Berlyn agreed that, by employing the heat exchangers to cool the molten plastic at the outlet and inlet ports of the CF and CSS devices, " 'you create a thermal seal, ... that's formed by the polymer itself[.]' " *Id.* at 1076.

Hence, the court determined that "[t]he CF and CSS machines seal in the same manner as required by the Kalman patent[,]" and that "[t]he plastic seals formed in the Berlyn CF and CSS devices are 'sealing plugs' under the Kalman patent." *Id.* at 1077. Accordingly, the court held that Berlyn's CF and CSS devices infringe the '017 patent. *See id.* at 1078.

### ii) Kalman VI—The Damages Trial

After the decision in the liability trial, the court conducted a trial to determine the amount of damages to which Dr. Kalman was entitled. In an effort to obtain the full amount of PDL's lost profits as damages, Dr. Kalman, in his post-trial brief, moved to amend the pleadings to add PDL as a plaintiff. *See Kalman v. Berlyn Corp.*, 9 USPQ2d 1191, 1192 (D.Mass.1988) (*Kalman VI*) (the damages trial). Dr. Kalman also sought lost profits damages, enhanced damages for willful infringement, and an award of attorney fees.

On the issue of Dr. Kalman's motion to add PDL as a plaintiff, the court stated that there was an important legal question as to "[w]hether PDL is an exclusive licensee for the manufacture of Auto-screens[,] ... and [that Berlyn] should have been afforded the opportunity to conduct discovery regarding the existence and terms of a licensing agreement between PDL and the plaintiff." *Id.* at 1193. Hence, the court denied Dr. Kalman's motion to add PDL as a plaintiff, and determined that Dr. Kalman's damages should be measured by his "entitlement to PDL's profits as a 50% shareholder in the company." *Id.* at 1194.

The court next determined the proper amount of damages due to Dr. Kalman. The court noted that there existed no acceptable non-infringing substitute for Dr. Kalman's "Autoscreen," and determined that in the absence of Berlyn's infringement, PDL would have made all Berlyn's sales. *See id.* at 1196. After determining PDL's lost profits, the court established Dr. Kalman's damages "by measuring the decrease in the value of his holdings in PDL which was caused by [Berlyn]'s infringement." *Id.*

Dr. Kalman also sought "lost profits for the sale of unpatented screens and accessories for the Autoscreen device, in addition to those lost profits attributable to the Autoscreen body itself." *Id.* The court noted that "[t]he filter screens and other parts are specifically designed for use with the Autoscreen and the Autoscreen is not guaranteed without the use of the special filter material." *Id.* at 1196–97. Hence, the court held that Dr. Kalman was enti-

tled to damages for the lost profits from lost sales of filter screens and accessories.

The court next considered "the incremental or variable costs which PDL would have incurred in manufacturing the additional equivalent devices." *Id.* at 1197. The court found that "[i]t is the business practice of PDL to pay its employees for an eight hour[ ] ... day, five days a week." *Id.* at 1198. The court also noted that the evidence at trial established that PDL's "cost of labor has been steady with respect to sales over the period in question." *Id.* Hence, the court determined that PDL's manufacturing cost is a "fixed cost." *See id.*

The court next calculated PDL's lost profits from diverted sales. The court stated that the evidence at trial established "that [Berlyn]'s prices were at least ten to fifteen percent higher than [PDL]'s during the relevant period." *Id.* at 1199. Hence, the court determined that PDL's damages included an additional 15% of its total sales of Autoscreen devices, as damages for maintenance of depressed prices. *See id.*

In addition, the court reduced PDL's lost profits by an amount attributable to PDL's corporate taxes in the United Kingdom. The court stated that "[b]ecause [Dr. Kalman] is a 50% shareholder of PDL, the measure of his damages is one half of PDL's net profit after taxes, the tax rate having been derived from PDL's corporate tax returns for the United Kingdom." *Id.* at 1198. The court also granted Dr. Kalman prejudgment interest on his damages, dating from 1977. *See id.* at 1199.

Dr. Kalman alleged that Berlyn's infringement of his Autoscreen device was willful, and sought enhanced damages. The court stated that the evidence at trial established that Berlyn "satisfied its duty by consistently seeking the opinion of outside counsel specializing in patent law since becoming aware of the '017 patent in 1971." *Id.* at 1200. The court also stated that "when the '017 patent was determined to be valid and infringed by the CF device, [Berlyn] ceased all sales of the CF device and began development of alternate designs, ultimately the CSS, again obtaining

legal advice regarding a design which would avoid infringement." *Id.* Hence, the court found that Berlyn did not willfully infringe the '017 patent, and denied enhanced damages. *See id.* at 1201. The court also denied Dr. Kalman's motion for attorney fees, on the grounds that the case was not exceptional. *See id.*

## DISCUSSION

### I. *Infringement*

■ The first issue that will be discussed is that raised by Berlyn's cross-appeal regarding infringement. The questions presented are whether Berlyn's CF device has sealing plugs falling within the claims of the '017 patent, and whether Berlyn's CSS device has sealing plugs and filter bands or ribbons as claimed by the '017 patent.

#### A. *Sealing Plugs of the CF and CSS Devices*

Berlyn asserts that the district court in the liability trial erred, in its finding of facts, in determining that the CF and CSS devices practice the sealing plugs as claimed by the '017 patent. A finding of fact "is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Spindelfabrik Suessen–Schurr Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075, 1077, 4 USPQ2d 1044, 1046 (Fed.Cir.1987), *cert. denied*, 484 U.S. 1063, 108 S.Ct. 1022, 98 L.Ed.2d 987 (1988).

According to the testimony of Mr. Gerald Berlyn, the CF and CSS devices utilize heat exchangers to cool the molten plastic and increase its viscosity. *See Kalman V*, 3 USPQ2d at 1076. In response to questioning, Mr. Berlyn agreed that the heat exchangers cool the hot polymer. *See id.* In addition, the operator's manual to Berlyn's CF device stated that instead of using traditional mechanical seals, the CF device employs a " 'sealing design utilizing the thermodynamic characteristics of the poly-

mer itself to form the seal.' " *Id.* The operator's manual applies to both the CF and CSS devices. Furthermore, in a 1976 article, Mr. Berlyn stated that the CF device uses "a simple but effective polymer 'plug' to provide a seal against melt leakage between the filter media and the screen changer's body." Berlyn, *Screen Changer Is 'Truly' Continuous*, Modern Plastics, Dec. 1976, at 62.

On the record before us, we cannot say that the district court's findings regarding the sealing plugs, as embodied by the CF and CSS devices, and claimed by the '017 patent, are clearly erroneous under the applicable standard of review. *See Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 961, 220 USPQ 592, 600 (Fed.Cir.1983), *cert. denied*, 469 U.S. 835, 105 S.Ct. 127, 83 L.Ed.2d 69, 225 USPQ 232 (1984). Hence, we conclude that the district court did not err in determining that the plastic seals formed in the Berlyn CF and CSS devices are "sealing plugs" under the '017 patent.

### B. *Filters of the CSS Device*

In its cross-appeal, Berlyn also asserts that "[t]he Court below erred in determining infringement by comparing the CSS to the CF, rather than to the claimed invention." Berlyn specifically asserts that its CSS device uses sliding cartridge filters, rather than the filter bands or ribbons claimed by the '017 patent.

It is not disputed on appeal that the only significant difference between Berlyn's CF and CSS devices is in the filtering structure. The filter cartridges of the CSS machine are linked by a clamp or frame, whereas the CF filter cartridges are linked by hooks and posts. In addition, instead of the three filter cartridges used in the CF device, the CSS device uses two cartridges. *See Kalman V*, 3 USPQ2d at 1074. The court found that "[i]n the context of the Kalman patent, these differences have no meaning[,] [since] [t]he Kalman invention requires continued controlled movement of screen filter material in the form of a 'band or ribbon' so as to avoid interrupting the extruder line." *Id.* at 1075. The district court determined that *"for the purposes of*

*infringement*, the Berlyn CF and CSS machines are structurally and functionally equivalent." *Id.* at 1075 (emphasis added).

Hence, the district court properly compared the CSS device to the '017 patent claims, and not simply to the CF device, as argued by Berlyn in its brief. Since we see no legal error in its comparison, we conclude that the underlying findings of fact were not clearly erroneous.

### II. *Amendment of Complaint*

The second issue which is raised on Dr. Kalman's appeal of the judgment in the damages trial, is whether the district court erred in denying Dr. Kalman's motion, pursuant to Rules 15 and 21 of the Federal Rules of Civil Procedure, to amend its pleadings to add PDL as a plaintiff. Dr. Kalman contends that the district court "abused its discretion in failing to add PDL as a party."

Rule 21 of the Federal Rules of Civil Procedure states that "[p]arties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." Fed.R.Civ.P. 21. Rule 15(a) provides that a party may amend its pleadings by leave of court, "and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). It is well established that "[a]fter a responsive pleading has been served, the standards for adding parties are the same whether the motion is made under Rule 15 or Rule 21...." 3A J. Moore, J. Lucas & G. Grotheer, *Moore's Federal Practice* ¶ 21.05[1] (2d ed. 1989).

In *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), the Supreme Court noted that:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'

In review of an order denying a motion to amend, a subject which is not unique to patent law, we look to the law of the regional circuit court. *See Senza–Gel Corp. v. Seiffhart,* 803 F.2d 661, 666–67, 231 USPQ 363, 367 (Fed.Cir.1986).

On appeal, review of a district court's denial of a motion to amend is limited to a determination of whether the court abused its discretion. *See Foman,* 371 U.S. at 182, 83 S.Ct. at 230; *Ondis v. Barrows,* 538 F.2d 904, 909 (1st Cir.1976). Nevertheless, "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Id. See also Evans v. Syracuse City School Dist.,* 704 F.2d 44, 46 (2d Cir. 1983). Generally, an " '[a]buse of discretion may be established by showing that the district court either made an error of law, or a clear error of judgment, or made findings which were clearly erroneous.' " *TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895, 898, 229 USPQ 525, 526 (Fed.Cir.) (quoting *Seattle Box Co. v. Industrial Crating and Packing, Inc.,* 756 F.2d 1574, 1581, 225 USPQ 357, 363 (Fed.Cir.1985)), *cert. denied,* 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986).

Applying these principles or standards to the record before us, we conclude that, in denying Dr. Kalman's motion to amend his complaint to add PDL as a plaintiff in the action, the district court committed a clear error of judgment, and therefore abused its discretion. It is clear from the record that, for purposes of Dr. Kalman's damages, Berlyn considered Dr. Kalman to be a single entity with PDL, that PDL had standing in this case, and that Berlyn had reason to know of PDL's interest and standing.

Since *Kalman I,* it has been clear to all parties that the Autoscreen device, manufactured and marketed solely by PDL, is an embodiment of the device claimed in the '017 patent. *See Kalman I,* 215 USPQ at 159. Indeed, in an agreed statement of uncontested facts filed before trial in *Kalman I,* the parties stipulated that Dr. Kalman had licensed PDL to manufacture and

sell filter devices under the '017 patent. The deposition testimony of Mr. Berlyn, taken before the damages trial, indicated that Mr. Berlyn considered Dr. Kalman and PDL to be a single entity. During the deposition, Mr. Berlyn repeatedly identified PDL's Autoscreen as "the Kalman machine" and "the Kalman Auto Screen." Furthermore, in a proposed schedule for discovery submitted by Berlyn prior to the damages trial, Berlyn stated that it "estimates it would need at least six months of discovery to take depositions of former Kalman customers who used Kalman's Autoscreen devices...." Berlyn explained that "[t]his discovery would be essential to rebut the expected Kalman assertion of lost profits for Berlyn's sales." In a subsequent motion, Berlyn stated that "if Kalman attempts to prove a 'lost profits' theory of damages, factors such as Kalman's costs of production, fixed overhead expenses, per-unit overhead expenses, sales prices etc. over a ten year period of time will be required."

Berlyn contends that Dr. Kalman's undue delay in moving to add PDL as a plaintiff prejudiced Berlyn, because Berlyn "was never made aware of any need to conduct discovery about any alleged 'tacit exclusive' license, since Kalman never advised Berlyn that PDL's 'tacit exclusive' license existed." The record indicates, however, that Berlyn obtained discovery of PDL's business. In response to requests for information on sales of Autoscreens, Dr. Kalman produced PDL invoices, PDL audited financial statements, PDL tax returns, and PDL price lists. All of these documents were clearly identified as belonging to PDL. In addition, at the damages trial, Dr. Kalman was questioned extensively about PDL's manufacturing and marketing operations.

Hence, the record indicates that Berlyn considered Dr. Kalman and PDL to be a single entity for purposes of damages, and that Berlyn was not harmed by a lack of discovery of PDL's business practices.

Berlyn contends, however, that "[a]lthough Berlyn may have been 'aware' of PDL, Berlyn was *never* notified and

*never* knew that PDL claimed an 'exclusive' license in the '017 patent...." (emphasis in original). Berlyn notes that, in 1976, Dr. Kalman granted a limited license to the Mobil Oil Corporation for the '017 patent. The license granted Mobil the right "to manufacture or have manufactured for it" screen changers as defined by the '017 patent. Berlyn also notes that Dr. Kalman granted licenses to use or acquire devices, under the '017 patent, to Kimberly–Clark, Rohm & Haas, Celanese, and Crown–Zellerbach. Berlyn does not contend, however, that Dr. Kalman granted any licenses *to sell* devices under the '017 patent.

It is well settled that a non-exclusive licensee of a patent has no standing to sue for infringement. *See Waterman v. Mackenzie,* 138 U.S. 252, 255, 11 S.Ct. 334, 335, 34 L.Ed. 923 (1891). Nonetheless, Dr. Kalman maintains that "PDL has legal standing to join as a co-plaintiff in this suit for damages."

In *Duplan Corp. v. Deering Milliken Research Corp.,* 522 F.2d 809, 186 USPQ 369 (4th Cir.1975), the appellant, DMRC, was an exclusive use licensee of patents concerning a machine that produces texturized yarn. DMRC sued several use sublicensees, alleging patent infringement. The defendants moved to dismiss, claiming that DMRC lacked standing, and the district court granted the motion. *See id.* at 811, 186 USPQ at 370. The patent owner, Chavanoz, then prosecuted the action in its own name, and DMRC sought to join as co-plaintiff. The district court denied DMRC's motion. *See id.*

On appeal, the Court of Appeals for the Fourth Circuit reversed. The court noted that "it is unnecessary for us to decide whether DMRC could have prosecuted such an action alone and in its own name had Chavanoz failed to join in the suit." *Id.* at 812, 186 USPQ at 371. The court framed the question presented as "whether the rights of DMRC as an exclusive use-licensee under patents owned by Chavanoz give it standing to act as a co-plaintiff with Chavanoz in prosecuting a patent infringement suit against those who allegedly infringed upon the exclusive use-license." *Id.* The court noted that:

> DMRC has shown that joinder of it as a co-plaintiff in the infringement action is necessary to protect the rights of all parties, to avoid the possibility of multiple suits upon a single cause of action, and to bring before the court all parties essential to resolution of the underlying dispute.

*Id.* at 816, 186 USPQ at 374. Hence, the appellate court reversed, and permitted DMRC to join as a co-plaintiff.

In *Weinar v. Rollform Inc.,* 744 F.2d 797, 223 USPQ 369 (Fed.Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1844, 85 L.Ed.2d 143 (1985), we reviewed a decision granting damages for patent infringement to co-plaintiffs Weinar, the owner of a patent on a wallboard fastener, and the National Gypsum Company (Gypsum), the sole United States distributor of Weinar's wallboard fasteners. On appeal before this court, the defendant contended "that Gypsum cannot as a matter of law be awarded damages because it owns no part of the patent and because it is not 'an exclusive licensee' (by which it means Gypsum does not have the exclusive right to make, use and sell)...." *Id.* at 806, 223 USPQ at 374.

We stated that the jury in *Weinar* "need not have determined that Gypsum was 'an exclusive licensee' as defined by [the defendant]." *Id.* at 807, 223 USPQ at 374. We noted that it was only necessary for the jury "to believe the testimony that an oral contract existed between Weinar and Gypsum, under which Gypsum had an exclusive right to sell as sole distributor in the United States." *Id.* Hence, we held that an exclusive vendor of a product under a patent could be a co-plaintiff in an action for patent infringement. *See also Sanofi, S.A. v. Med–Tech Veterinarian Prods., Inc.,* 222 USPQ 143, 149, 1983 WL 417 (D.Kan. 1983) (licensee with exclusive right to sell patented product in the United States has standing to join as co-plaintiff in patent infringement action).

It is important to note that in this case we do not give any licensee who joins the

patentee standing to sue an infringer. When the sole licensee, however, has been shown to be directly damaged by an infringer in a two supplier market, and when the nexus between the sole licensee and the patentee is so clearly defined as here, the sole licensee must be recognized as the real party in interest. Furthermore, in determining that PDL has standing to join as a co-plaintiff, we not only give effect to principles of equity, but also the Congressional mandate that, in patent actions, "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement...." 35 U.S.C. § 284 (1982). *See also Graf v. Hope Bldg. Corp.*, 254 N.Y. 1, 13, 171 N.E. 884, 888 (1930) (Cardozo, J., dissenting) ("Let the hardship be strong enough, and equity will find a way, though many a formula of inaction may seem to bar the path.").

## III. *Damages*

As a preliminary matter, it is important to note that, in patent infringement actions, "[d]eciding how much to award as damages is not an exact science, and the methodology of assessing and computing damages is committed to the sound discretion of the district court." *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1576–77, 12 USPQ2d 1026, 1028 (Fed.Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990). In addition, " 'any doubts regarding the amount must be resolved against the infringer.' " *Ryco, Inc. v. Ag–Bag Corp.*, 857 F.2d 1418, 1428, 8 USPQ2d 1323, 1331 (Fed.Cir.1988) (quoting *Lam, Inc. v. Johns–Manville Corp.*, 718 F.2d 1056, 1065, 219 USPQ 670, 675 (Fed. Cir.1983)).

In order to prevail on an appeal from a damages judgment, the appellant "must convince this court that the district court's decision is based on an erroneous conclusion of law, clearly erroneous factual findings, or a clear error of judgment amounting to an abuse of discretion." *Amstar Corp. v. Envirotech Corp.*, 823 F.2d 1538, 1542, 3 USPQ2d 1412, 1415 (Fed.Cir.1987). We also note that "[w]hen no contrary evidence exists in the record, bald assertions that the testimony is self serving and de-

fies common sense cannot form a 'basis on which this court could engage in the normally inappropriate process of substituting a contrary credibility determination for that of the district court.' " *TWM*, 789 F.2d at 902, 229 USPQ at 529 (quoting *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 999, 228 USPQ 562, 565 (Fed. Cir.), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986)).

### A. *Dr. Kalman's Appeal*
#### 1. *Deduction of British Corporate Taxes*

Dr. Kalman contends that the district court's "deduction of corporate taxes from PDL's lost profits to arrive at Dr. Kalman's award was clearly erroneous and an error of law." In view of our conclusion that PDL should be added as a co-plaintiff, and that, as co-plaintiffs Dr. Kalman and PDL should recover the full amount of damages, we need not decide the modification of the damage award by deducting British corporate taxes before determining Dr. Kalman's damages as a shareholder.

As to the propriety of deducting British corporate taxes from PDL's damages as a corporation, reference should be made to *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). In *Hanover Shoe*, the Supreme Court reviewed a decision of the court of appeals remanding an antitrust action to the district court for the deduction of taxes from a damages award to a corporate plaintiff. *See id.* at 502, 88 S.Ct. at 2236. The court of appeals remanded because "since only after-tax profits can be reinvested or distributed to shareholders, [the plaintiff] was damaged only to the extent of the after-tax profits that it failed to receive." *Id.* at 503, 88 S.Ct. at 2236. The Supreme Court noted that it is the policy of the Internal Revenue Service to tax damage awards when they are received, and:

> to diminish the actual damages by the amount of the taxes that it would have paid had it received greater profits in the years it was damaged would be to apply

a double deduction for taxation, leaving [the plaintiff] with less income than it would have had if [the defendant] had not injured it.

*Id.* Hence, the Court held that taxes should not be deducted from the plaintiff's damages award.

The *Hanover Shoe* rule has been followed in patent infringement cases. For example, in *Paper Converting Mach. Co. v. Magna–Graphics Corp.*, 576 F.Supp. 967, 978–80, 220 USPQ 1057, 1065–66 (E.D. Wisc.1983), *aff'd in part*, 745 F.2d 11, 223 USPQ 591 (Fed.Cir.1984), the court's detailed computation of lost profits damages included income before income taxes. Furthermore, it has been stated that the deduction of income taxes from a computation of lost profits damages:

> runs into difficulty for several reasons. First, the award will be taxable. If taxes are deducted before it is made, the plaintiff will be in a position of having to pay taxes twice. Second, it is impossible to determine precisely what taxes will be paid, because the other income and deductions the plaintiff may have in the year of receipt of the award will affect the amount of taxes to be paid.

R. Dunn, *Recovery of Damages For Lost Profits* § 6.8 (1987).

Hence, we conclude that the district court erred in deducting British corporate taxes from the computation of PDL's lost profits.

## 2. *Willful Infringement*

■ Dr. Kalman contends that "[t]he district court's finding that Berlyn's infringement was not willful is clearly erroneous."

Pursuant to 35 U.S.C. § 284, the court in a patent infringement action may award enhanced damages for willful infringement. *See Ryco*, 857 F.2d at 1429, 8 USPQ2d at 1332. Absent an abuse of discretion, the decision of the district court regarding enhanced damages will not be disturbed. *See TWM*, 789 F.2d at 902, 229 USPQ at 529.

A finding of willfulness on the part of an infringer is a question of fact, to be reviewed under the clearly erroneous stan-

dard. *See Ryco*, 857 F.2d at 1428, 8 USPQ2d at 1331. The court must consider the totality of the circumstances, including "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed...." *Bott v. Four Star Corp.*, 807 F.2d 1567, 1572, 1 USPQ2d 1210, 1213 (Fed.Cir.1986). In this case, the record indicates that Berlyn conducted an investigation of the '017 patent, and formed a good-faith belief that the '017 patent was invalid.

In 1971 and 1972, Berlyn developed two plastic filtration device designs, with the intent to manufacture and market the devices. For both designs, Berlyn obtained written opinions by outside patent counsel, Mr. Leonard Santisi, that the '017 patent was invalid. Mr. Berlyn testified at the damages trial that, prior to beginning the manufacture of CF machines in 1976, he had obtained oral opinions of non-infringement not only from Mr. Santisi, but also from Mr. Alfred Rosen, a second outside patent counsel. In addition, after it began selling CF devices in 1976, Berlyn obtained the written opinion of Mr. Rosen that "[w]e have found no United States patent in force which, in our opinion, would be infringed by the manufacture, use or sale of the Berlyn Continuous Filter...."

Mr. Berlyn also testified at the damages trial that, prior to the litigation concerning Kimberly–Clark, patent attorneys for Kimberly–Clark requested a meeting with Dr. Kalman's attorneys in order "to evaluate the relative merits of this case ... with reference to validity and infringement, and to establish their position with reference to their proceeding with this or not proceeding with it." Mr. Berlyn testified that, at the meeting, both in-house counsel and outside patent counsel for Kimberly–Clark stated "that they felt that the Kalman patent was invalid, and not infringed, and on the basis of that meeting, and our discussions with them, decided to proceed with the case."

In determining willfulness, it is also relevant to note whether the infringer acted in good faith during the litigation. *See Bott*, 807 F.2d at 1572, 1 USPQ2d at 1213. Dr. Kalman asserts that Berlyn's bad faith is illustrated by Berlyn's decision *"not to stop, but to continue, making and selling CF machines in the face of the Wisconsin Court's decision in Kalman I."* (emphasis in original). Mr. Berlyn, however, testified that after the decision of the district court in *Kalman I* that the '017 patent was valid, Mr. Santisi nevertheless maintained that the patent was invalid, and that the decision would be overturned on appeal. In addition, after *Kalman III*, in which this court held that the CF device infringed the '017 patent, Berlyn ceased selling its CF device. Also, in an August 3, 1983 letter to in-house counsel for Kimberly–Clark, Mr. Santisi stated that after the decision in *Kalman III*, Berlyn had begun to develop a non-infringing substitute for the CF device.

After a review of the totality of the circumstances, we conclude that the determination of the district court in the damages trial, that Berlyn did not willfully infringe the '017 patent, was not clearly erroneous. Hence, the district court correctly determined that Dr. Kalman was not entitled to enhanced damages.

### B. *Berlyn's Cross–Appeal*

#### 1. *Lost Profits Measure of Damages*

■ Berlyn contends that Dr. Kalman was not entitled to a lost profits measure of damages, since "the evidence clearly established that many commercially available devices for filtering plastics were regarded as viable options by the users for the same applications for which the Berlyn CF, CSS and Autoscreen are recommended, offered and sold." According to Berlyn, evidence at trial indicated that Berlyn devices and the Autoscreen accounted for only approximately 3% of the filtration devices used in plastic extrusion lines in the United States. Hence, Berlyn concludes that "[o]bviously, 97% of the customers having applications for which both the Autoscreen and the Berlyn continuous filters are specifically

recommended regard many other filters as acceptable substitutes."

A patent owner may obtain lost profits in a patent infringement action by establishing:

(1) a demand for the patented product during the period of infringing sales; (2) an absence of acceptable noninfringing substitutes; (3) the patent owner had the ability to meet the demand for the products covered by the patent; and (4) the amount of profit the patent owner would have made.

*Ryco*, 857 F.2d at 1427, 8 USPQ2d at 1331. Furthermore, "[i]t is the patentee's burden ... to prove by a preponderance that 'but for' the infringement, the patent holder would have made the sales." *Yarway Corp. v. Eur–Control USA, Inc.*, 775 F.2d 268, 275, 227 USPQ 352, 357 (Fed.Cir.1985). Hence, "when the parties involved in an action are the only suppliers in the market, lost profits are a particularly appropriate measure of damages." *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*, 761 F.2d 649, 653, 225 USPQ 985, 987 (Fed.Cir. 1985).

While there may be competing devices available in the marketplace, the "[m]ere existence of a competing device does not make that device an acceptable substitute." *TWM*, 789 F.2d at 901, 229 USPQ at 529. It is clear that " '[a] product lacking the advantages of [the] patented [device] can hardly be termed a substitute "acceptable" to the customer who wants those advantages.' " *Id.* (quoting *Panduit Corp. v. Stanlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1162, 197 USPQ 726, 734 (6th Cir. 1978) (Markey, C.J., sitting by designation)). *See also Yarway*, 775 F.2d at 276, 227 USPQ at 357.

In this case, the evidence at trial indicates that other plastic extrusion devices, besides Berlyn's devices and the Autoscreen, do not allow for a continuous filtration, at constant pressure, with effective sealing. On the record before us, we cannot say that the district court's finding of a two-supplier market was clearly erroneous. Hence, the district court correctly deter-

mined that Dr. Kalman was entitled to lost profits damages.

### 2. Lost Profits of Filter Screens

■ Berlyn contends that the district court erred in including, in Dr. Kalman's damages, lost profits for lost sales of filter screens. At trial, Dr. Kalman testified that the screens were usually sold with the Autoscreens. Mindful of the deference to be accorded the district court in its determination of damages, and on the record before us, we find that the court's determination is not clearly erroneous. *See Ryco*, 857 F.2d at 1428, 8 USPQ2d at 1331.

### 3. Fixed Labor Costs

■ Berlyn contends that "[t]he court erred in excluding direct labor as a variable cost." Specifically, Berlyn argues that the district court in the damages trial "clearly erred in calculating PDL's hypothetical profit margin by assuming that no additional labor would be required to produce additional Autoscreens."

The determination of the district court is based on the testimony of Dr. Kalman, who stated that, to produce enough additional Autoscreens to make all Berlyn's sales, PDL would not need to increase its workforce or working hours. Because of the deference to be accorded the district court in its determination of damages, and on the record before us, we find that the court's determination is not clearly erroneous. *See Ryco*, 857 F.2d at 1428, 8 USPQ2d at 1331.

### 4. Actual Sales Price

■ Berlyn also contends that the district court erred in ignoring PDL's real invoice prices for the years 1977–1982, having used, instead, higher reconstructed prices. The district court relied on reconstructed price lists from 1977 to 1982 because Dr. Kalman could not produce actual price lists from this period. The reconstructed prices for the Autoscreens consist of the base price, obtained from the invoices, and the price of the electronic controls. The reconstructed price lists were fully supported by the testimony of Dr. Kalman.

On the record before us, we conclude that the court's determination is supported by the record, and that the court did not err.

### 5. Depressed Prices

■ Finally, Berlyn claims that it was error for the district court to award an additional fifteen percent over the sales price for maintenance of depressed prices. Berlyn maintains that since its filtration devices were considerably more expensive than the Autoscreens, "[i]t is not logical to infer that PDL would *reduce* its price to meet Berlyn's *higher* price." (emphasis in original).

The district court's determination was supported by the testimony of Dr. Kalman, who testified that "[i]f Berlyn were not in the field, I would have certainly charged a higher price and possibly more than Berlyn, but I couldn't do that with Berlyn in the market." In addition, it is important to note that we have permitted an award of damages for depressed prices based on testimony of a patent owner. *See TWM*, 789 F.2d at 902, 229 USPQ at 529. Hence, on the question of depressed prices, Berlyn has failed to show that the court's inference, based upon the testimony at trial, was clearly erroneous.

## IV. Prejudgment Interest

■ Asserting that Dr. Kalman was responsible for undue delay in prosecuting the lawsuit, Berlyn contends that "[t]he district court abused its discretion in awarding prejudgment interest prior to October 7, 1982." October 7, 1982 is the date that Dr. Kalman filed the complaint in *Kalman IV*, alleging that Berlyn's CF device infringed the '017 patent.

Congress has directed that, in patent infringement actions, "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, ... together with interest and costs as fixed by the court." 35 U.S.C. § 284 (1982). The standard of review is basic that "a decision to award prejudgment interest will only be set aside if it constitutes an abuse of discretion." *General Motors Corp. v. Devex Corp.*, 461 U.S.

648, 656, 103 S.Ct. 2058, 2063, 76 L.Ed.2d 211, 217 USPQ 1185, 1188 (1983).

Berlyn claims that, since Dr. Kalman knew about the CF device since December, 1976, he engaged in undue delay, because he did not bring suit against Berlyn until October, 1982. It should be noted, however, that Dr. Kalman was engaged in litigation with Kimberly–Clark, regarding infringement of the '017 patent by Berlyn's CF device, since 1978. It is undisputed that Berlyn knew of this litigation, and controlled and financed Kimberly–Clark's defense. Under the circumstances, we conclude that the award of prejudgment interest does not constitute an abuse of the district court's discretion.

### V. *Attorney Fees*

 Dr. Kalman contends that the district court in the damages trial abused its discretion in failing to award attorney fees under 35 U.S.C. § 285.

We have noted that "[w]hen a court declines to award attorney fees on the basis of a determination that a case is not exceptional, the fact findings underlying that determination are reviewed under the clearly erroneous standard." *Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565, 1580, 230 USPQ 81, 91 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987). Furthermore, "[m]erely losing on the defenses of invalidity and non-infringement is not enough to make a case exceptional." *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1238, 224 USPQ 418, 426 (Fed.Cir.1985).

The record before us contains abundant evidence of Berlyn's efforts in obtaining advice of counsel, as well as its good faith in challenging the '017 patent. Hence, we conclude that the district court did not abuse its discretion in denying Dr. Kalman's motion for attorney fees.

### CONCLUSION

As to Dr. Kalman's appeal, we conclude that the district court erred in denying Dr. Kalman's motion to add PDL as a plaintiff, and in deducting from Dr. Kalman's damages an amount attributable to British corporate taxes. Hence, we hold that the complaint may be amended to add PDL as a plaintiff, and that Dr. Kalman and PDL, as co-plaintiffs, should recover the full amount of lost profits damages caused by Berlyn's infringement, without any deduction for British corporate taxes. We also hold that the district court did not err in denying Dr. Kalman's motions for enhanced damages and attorney fees.

As to Berlyn's cross-appeal, we conclude that the district court did not err in holding that Berlyn's CF and CSS devices infringe the '017 patent. We also conclude that the district court did not err in its determination of Dr. Kalman's damages, and reject all of Berlyn's assignments of error. Finally, we hold that the district court did not err in granting Dr. Kalman prejudgment interest dating from 1982.

### COSTS

No costs.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.